AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| TWO CELLULAR DEVICES, A BLACK APPLE IPHONE AND BLACK ALCATEL FLIP PHONE, THAT ARE CURRENTLY IN THE POSSESSION OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES AT 90 K STREET NE IN WASHINGTON, D.C. UNDER RULE 41 | ) ) ) ) ) |

Case No.  21-SC-1418

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located in the _____District of Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1); 21 U.S.C. § 841; 22 D.C. Code § 4503(a)(1), (b)(1). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Kevin Smith, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_Telephone_____ *(specify reliable electronic means).*

Date:    _____4/30/2021_____

_____
*Judge's signature*

City and state:    _____Washington, D.C._____

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means     ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  21-SC-1418 |
| TWO CELLULAR DEVICES, A BLACK APPLE IPHONE AND BLACK | ) |
| ALCATEL FLIP PHONE, THAT ARE CURRENTLY IN THE | ) |
| POSSESSION OF THE BUREAU OF ALCOHOL, TOBACCO, | ) |
| FIREARMS, AND EXPLOSIVES AT 90 K STREET NE IN | ) |
| WASHINGTON, D.C. UNDER RULE 41 | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 13, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 4/30/2021 _____          _____
                                                                                                              *Judge's signature*

City and state: _____ Washington, D.C. _____          _____
                                                                                                              G. Michael Harvey
                                                                                                              United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-1418 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The properties to be searched are a black Apple iPhone encased in a gray and white cell phone case, and a black Alcatel "flip phone", IMEI 015565004066770, with a slightly cracked screen hereinafter referred to as "TARGET DEVICES". The TARGET DEVICES are currently stored at 90 K Street NE, Washington, DC, which is the Washington Field Division of ATF.

## ATTACHMENT B

*Property to be seized*

1.    The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 922(g)(1), 21 U.S.C. § 841, and 22 D.C. Code § 4503(a)(1), (b)(1) (hereinafter "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data:

1. Establishing or documenting the commission of the TARGET OFFENSES;

2. Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

3. Reflecting the ownership and use of the item identified in Attachment A by the individual committing the TARGET OFFENSES;

4. Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

5. Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

6. Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

7. Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES;

8. Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics in violation of the TARGET OFFENSES; and

9. Documenting or containing evidence of the purchase of items from the assets derived from the commission of a narcotics trafficking offense in violation of the TARGET OFFENSES.

10. Any records and information relating to stash houses, firearms, purchasers and suppliers of drugs;

11. Evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

12. Evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

13. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

14. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

15. Evidence of the times the Device(s) was used;

16. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

17. Documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

18. Records of or information about Internet Protocol addresses used by the Device(s); and

19. Records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

TWO CELLULAR DEVICES, A BLACK
APPLE IPHONE AND BLACK ALCATEL
FLIP PHONE, THAT ARE CURRENTLY IN
THE POSSESSION OF THE BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND
EXPLOSIVES AT 90 K STREET NE IN
WASHINGTON, D.C. UNDER RULE 41

21-sc-1418

UNDER SEAL

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Kevin T. Smith, Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Washington Field Division, Washington, D.C., being duly sworn, hereby depose, and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a digital device—which is currently in law enforcement possession (the "TARGET DEVICES"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      I have been a Special Agent with ATF since August of 2015 and previously worked as a Criminal Investigator with the United States Marshals Service. I am currently assigned to the

ATF Washington Field Division, High Intensity Drug Trafficking Area (HIDTA) group, which is tasked with investigating drug and firearm related crime.

4.      I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other local and state law enforcement agencies. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous firearm and narcotics trafficking investigations that resulted in the arrest and convictions of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief. The sources of my information and belief include, but are not limited to, oral and written reports regarding this and other investigations that I have received, directly or indirectly, from agents of the ATF, and officers of the Washington, D.C.,

Metropolitan Police Department (MPD).

7.     As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other ATF agents and other law enforcement officers who are involved in this investigation, I am familiar with all aspects of this investigation.

8.     Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1), 21 U.S.C. § 841, and 22 D.C. Code § 4503(a)(1), (b)(1) have been committed by Wayne Rushing (hereinafter, referred to as "RUSHING").  There is also probable cause to search the Device(s), further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9.     The properties to be searched are a Black Apple iPhone and a Black Alcatel Flip Phone, as described in Attachment A, that is, the "TARGET DEVICES"

10.     The TARGET DEVICES are currently in the possession of ATF at 90 K Street NW in Washington, D.C.

## PROBABLE CAUSE

11.     On April 22, 2021, at approximately 1740 hours, members of the Seventh District Crime Suppression Team (CST) were conducting firearms interdiction in the Patrol Service Area (PSA) 704. Officers were working the evening tour of duty, in full uniform and were operating a marked scout car.

12.     CST members proceeded to the 3400 block of 22nd Street SE in Washington DC. Officers knew this area to be an open air drug market, and were aware of nine recent "sound of

gunshots," calls for service, with a total of approximately 40 individual gunshots detected by Shot Spotter in the previous 7 days.

13.     Officers observed several subjects standing in front of a bricked area with one subject appearing to be in the process of a hand to hand narcotics transaction. This individual was weighing a quantity of what appeared to be marijuana on a digital scale. After weighing the suspected marijuana, the individual handed it to another individual who was later identified as Wayne RUSHING. Officers approached the individuals and inquired about the suspected marijuana sale that had taken place. RUSHING and other subjects stated something to the effect of, "Yeah, it's just weed." As Officers spoke with the individuals in the area, they noticed a large bulge with distinct hard edges in the crotch area of RUSHING. Officers observed that the bulge was shaped like a firearm magazine and was inconsistent with the human anatomy. Based on Officers' training and experience in conducting firearm interdiction, Officers knew that individuals attempting to conceal firearms routinely concealed them in their crotch area. Additionally, Officers observed that RUSHING was wearing several layers of undergarments. Based on Officers' training and experience, individuals attempting to conceal illegal firearms in or about the crotch or waistband area, routinely wear extra undergarments in order to further conceal and provide stability to the firearm as it is maintained in the waistband and/or crotch area of their pants or shorts.

14.     Officers questioned RUSHING as to the object concealed in his crotch area, to which, RUSHIING stated, "Nothing." Officers pointed to the area where they believed RUSHING to be concealing a firearm and again questioned RUSHING about the bulge in his crotch area. RUSHING stated something to the effect of, "I have something in my pocket," and pointed to a different pocket than the pocket that the Officers were previously referencing. Based

on the location of the bulge and the distinct hard edges of the item that RUSHING concealed, in conjunction with the item being secured by several layers of undergarments, Officers believed that RUSHIING was concealing a firearm.

15.     Officers conducted a protective pat down of the outer garment of the unique shaped bulge and immediately recognized the item as a firearm. Officers recovered a green and black Polymer 80, 9 millimeter pistol from the area where they performed the protective pat down of RUSHING's person. The firearm was loaded with 1 round of ammunition in the chamber and 26 rounds in an extended magazine. The firearm appeared to be fully functional and capable of expelling a projectile by means of an explosive action. In addition, the firearm was equipped with an illegal attachment that converts Semi-Automatic firearms to Fully Automatic.

16.     RUSHING was placed under arrest and transported to MPD's Seventh District Police Station. During a search of RUSHING's personal effects at MPD's Seventh District, Officers located 1 white pill which was determined to be Oxycodone. Additionally, the two TARGET DEVICES were recovered from RUSHING's person and secured in anticipation of obtaining a search warrant. RUSHING was charged with Carrying a Pistol Without a License Outside Home or Business, Possession of Unregistered Firearm/Unlawful Possession of a Firearm or Destructive Device, Possession of a Large Capacity Feeding Device, Possession of Unregistered Ammunition. Possession of a Controlled Substance.

17.     On April 23, 2021, RUSHING was charged by Criminal Complaint in District of Columbia Superior Court Criminal Case No. 2021 CF2 002323 with Unlawful Possession of a Firearm (Prior Conviction), in violation of 22 D.C. Code, Section 4503 (a)(1) (2001 ed.).

18.     For the same conduct as outlined above, Defendant has been charged by two-count Indictment in United States District Court for the District of Columbia Criminal Case No.

21-cr-329, charging RUSHING with Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year (18 U.S.C. § 922(g)(1)) and Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year (22 D.C. Code § 4503(a)(1), (b)(1)).[1]

19.     A search of a RUSHING's criminal history showed that on February 8, 2014, in District of Columbia Superior Court Criminal Case No. 2013 CF2 010664, RUSHING plead guilty to Attempt to Commit Robbery, which was a crime punishable by more than 12 months of incarceration. For that crime, RUSHING was sentenced to 18 months of incarceration and 3 years of Supervised Release.

20.     In 2019, RUSHING was arrested by MPD for Possession with Intent to Distribute a Controlled Substance While Armed. RUSHING later pled guilty to Possession with Intent to Distribute a Controlled Substance.

21.     The TARGET DEVICES are currently in the lawful possession of ATF and stored at 90 K Street NE in Washington, D.C. The TARGET DEVICES came into ATF's possession through MPD CST.  As discussed, MPD CST recovered the TARGET DEVICES during a search incident to arrest of RUSHING on April 22, 2021. Located inside of the gray phone case, which housed the Apple iPhone (TARGET Device), was among other items, a picture identification card for Wayne RUSHING.

22.     The execution of a search warrant on the TARGET DEVICES would allow law enforcement to, among other things: (i) identify communications relating to the trafficking of

---

[1] RUSHING has not yet had an initial appearance before the United States District Court for the District of Columbia.  However, upon his initial appearance, the U.S. Attorney's Office for the District of Columbia has informed your affiant that they will then move to dismiss the pending D.C. Superior Court case as both cases involve the same conduct.

illegal firearms, firearm components, narcotics and communications evidencing the relationship between parties; (ii) provide contact information regarding potential suppliers, customers, and distributors of firearms; (iii) identify meeting locations for the potential commencement of illegal firearms transactions or acquisition of firearms; and (iv) identify photographs of firearms, members of the firearms trafficking conspiracy. All of the aforementioned information would constitute evidence of the commission of the TARGET OFFENSES by RUSHING.

## **TECHNICAL TERMS**

23.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not

11

limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

       3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

       b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global

positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a

13

string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers,

including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial

15

organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.

The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

      p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

24.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a. Based on your affiant's knowledge, training, and experience, and in the knowledge, training, and experience of other members of the ATF, cellphones are tools of the narcotics trade. Narcotics traffickers communicate with customers, suppliers, and coconspirators via cellphones. Narcotics traffickers use cellphones to arrange meetings, request narcotics, take narcotics orders, and arrange for coconspirators to obtain and distribute narcotics. To avoid detection by law enforcement, drug traffickers commonly use more than one cellphone and often send text messages, rather than engage in oral communications.

b.     Cellphones used by narcotics traffickers contain valuable information and evidence relating to their narcotics trafficking.  Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video,

18

Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking of narcotics; (ii) identify locations where narcotics traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the cellphones by the narcotics traffickers; (iv) document meetings and communications between narcotics traffickers, their customers, associates, and coconspirators; (v) reflect communications between narcotics traffickers and other individuals, discussing the trafficking of narcotics; (vi) reflect communications between narcotics traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

        c.      Additionally, based on your affiant's knowledge, training, and experience, and in the knowledge, training, and experience of other members of the ATF, cellphones are tools of the firearms trafficking trade as well. Firearms traffickers communicate with customers, suppliers, and coconspirators via cellphones. These firearm traffickers use cellphones to arrange meetings, request additional firearms or firearm parts, take firearm orders, and arrange for coconspirators to obtain and distribute firearms. To avoid detection by law enforcement, firearm traffickers also commonly use more than one cellphone and often send text messages, rather than engage in oral communications. Based on your affiant's knowledge, training, and experience, it is common practice for firearms traffickers or illegal possessors of firearms to utilize cellphones to photograph firearms or firearm parts which are in their possession. In many cases these

photographs are submitted to social media platforms or utilized as advertisements for future firearms trafficking or other illicit activity.

        d.        Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        e.        Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital

20

device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

25.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often

store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.     Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team

22

and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## CONCLUSION

26. Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICES contain evidence of the TARGET OFFENSES.

27. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

28. I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICES are contained on the premises of ATF.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

_____
Kevin T. Smith, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

23

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 30, 2021.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE